# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | 3:10-cr-132 (CFD) |
| | : | |
| | : | |
| WOLFE MIKELIC | : | |

## RULING ON MOTION TO SUPPRESS & MOTION FOR *FRANKS* HEARING

The defendant, Wolfe Mikelic, is charged with conspiracy to distribute and possession with intent to distribute marijuana.[1]  Mikelic has moved to suppress (1) evidence seized during a search of a leased storage unit in Branford, Connecticut; (2) evidence seized from Mikelic's car following his arrest on January 29, 2010; and (3) oral statements that Mikelic made following his arrest.[2]  Mikelic has also moved for a Franks hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).  The Court held an evidentiary hearing on June 29, 2011.  The Court's findings of fact and conclusions of law follow.

## I.    Findings of Fact

On January 27, 2010, Officer Michael Paleski of the Branford Police Department in Connecticut was contacted by Detective Lieutenant Carroll of his department regarding a motor

---

[1] Mikelic is charged in a two count indictment with conspiracy to possess with the intent to distribute 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii) (Count One) and possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c) (Count Two).

[2] Mikelic previously contested the search of his New York residence, but appears to have abandoned that argument.  Accordingly, the Court does not address that search in its Ruling.

vehicle stop of a rental car that had occurred that day in Nebraska. During that stop, the Nebraska State Patrol seized $100,000 in cash as well as apparent drug ledgers, a bill of lading and other shipping receipts, photographs of large marijuana fields, and a car rental receipt from the rental car operated by Bret Battistelli.[3] At the time, Officer Paleski was on assignment with the New Haven Drug Task Force of the federal Drug Enforcement Administration ("DEA"). Lieutenant Carroll showed Officer Paleski several emails that he had received from the Nebraska State Patrol. Attached to those emails were copies of the ledgers, shipping receipts, the bill of lading, and photographs seized during the Nebraska stop.[4] The bill of lading and the shipping receipts contained a delivery address for a number of recent deliveries to a warehouse at 4 Sycamore Way, Unit 7A, in Branford. Officer Paleski believed that, based on the information provided by the Nebraska State Patrol, the Branford warehouse may have been used as a shipping and distribution point for substantial quantities of marijuana.

The following day, January 28, 2010, Officer Paleski and Detective Paul Perrotti of the Branford Police Department began investigating the Branford warehouse, and Lieutenant Carroll initiated twenty-four hour surveillance of the warehouse. Officer Paleski also submitted an administrative subpoena for utility subscriber information for Unit 7A. The response to that subpoena revealed that "Wolfe Mikelic" from New York was the subscriber for that location.

---

[3] It was later discovered that Battistelli is Mikelic's half-brother.

[4] Mikelic previously moved to suppress the evidence seized in Nebraska, alleging that the Nebraska State Patrol lacked probable cause to search Battistelli's rental vehicle. In a May 11, 2011 ruling, this Court found that Mikelic did not have a reasonable expectation of privacy in the areas and items searched in Nebraska, and therefore held that Mikelic did not have standing to challenge the constitutionality of the Nebraska search. See generally United States v. Mikelic, No. 3:10–cr–132, 2011 WL 1837844 (D. Conn. May 11, 2011).

The response to that subpoena also included contact information for Mikelic, including the phone number (914) 475-2401, which matched a number found in Battistelli's cellular phone by the Nebraska State Patrol.[5]  Officer Paleski subsequently drove to the Branford warehouse.  Officer Paleski observed two buildings, each with seven rental storage units of similar size.  Unit 7A had front and rear bay doors, a front door, and a side door.

Officer Paleski and Lieutenant Carroll arranged for a dog and his handler from the East Haven Police Department to conduct a perimeter "sniff" search of the Branford warehouse unit on January 28.  Officer Paleski and Lieutenant Carroll met East Haven Police Officer David Cari and his dog, "Daro," in the parking lot near the Branford warehouse.  Officer Paleski followed Officer Cari and Daro around the perimeter of Unit 7A.  Neither the officers nor the dog entered the unit; rather, they remained in public areas around the exterior of the unit throughout the perimeter search.  The dog alerted to the presence of drugs three times—at the front bay door, the front door, and the rear bay door.  Officer Cari indicated that given the weather conditions (cold and windy) and the dog alerting on three occasions, it was his belief that there was a significant amount of narcotics inside the storage unit.

The next day, January 29, 2010, Officer Paleski and Detective Perrotti prepared an affidavit and application for a State of Connecticut Superior Court Search and Seizure Warrant for the storage unit.  While they were drafting the application for the search warrant, Detective Tobin of the Branford Police Department, who was conducting surveillance of Unit 7A, called Officer Paleski and informed him that a light-colored Mercedes with New York license plates had just arrived at the warehouse.  The vehicle subsequently left the warehouse and drove across

_____

[5] The name "Wolfe" also appeared in some of the papers seized during the Nebraska stop.

the street to the parking lot where Detective Tobin was conducting surveillance. The operator—later identified as Mikelic—parked his car next to Detective Tobin's car, got out of his car, looked into Detective Tobin's vehicle, and then entered "Humphrey's," a nearby restaurant. Officer Paleski left the Branford Police Department and drove out to the parking lot. Officer Paleski then reported the license plate number to Branford Police Dispatch, and learned that the vehicle was registered to "Wolfe Mikelic."

After requesting additional surveillance of the warehouse, Officer Paleski and Detective Perrotti drove to the Connecticut Superior Court in New Haven, Connecticut, and obtained a signed search warrant for the Branford warehouse unit. The warrant was issued at 2:03 p.m. on January 29, 2010.

While Officer Paleski was obtaining the search warrant, DEA Agent Jon Rubinstein was dispatched to supervise the surveillance of the Branford warehouse. When he arrived at the warehouse, at approximately 1:00 p.m., Agent Rubinstein observed Mikelic walking around the storage unit.[6] Shortly thereafter, a New England Land Air delivery truck pulled into 4 Sycamore Lane and parked in the rear of Unit 7A.[7] Several large crates were unloaded from the delivery truck into Unit 7A.

After delivering the crates, the New England Land Air delivery truck left the Branford warehouse, as did Mikelic in his Mercedes; Lieutenant Carroll followed the truck and Agent

---

[6] Mikelic had returned to the storage unit from the Humphrey's parking lot.

[7] The same trucking company was identified in the shipping documents seized in the Nebraska stop.

Rubinstein followed Mikelic.[8]  Mikelic drove to a nearby restaurant—"The Chowder Pot"—and parked his car in the restaurant parking lot.  Agent Rubinstein followed Mikelic into the parking lot, parked his car near Mikelic's, and approached Mikelic's vehicle with his badge displayed and his weapon drawn.  Two other officers also approached Mikelic's vehicle at that time.  The officers ordered Mikelic to exit his vehicle, and Mikelic complied.  Immediately upon exiting his car, the officers frisked Mikelic, handcuffed him with his hands behind his back, and placed him in the back of one of the agents' cars.

Agent Rubinstein joined Mikelic in the back of the agent's car and asked Mikelic where he came from and what was delivered to his Branford warehouse.  Mikelic responded "you know where I just came from" and "you know what was delivered."  Agent Rubinstein then asked Mikelic if there was anything in his car that he would be concerned about; Mikelic denied having any contraband in his car and gave Agent Rubinstein permission to search his car.  Agent Rubinstein reconfirmed with Mikelic his consent for the officers to search his car.  Agent Rubinstein and another officer subsequently searched the Mercedes and found a package containing heat sealed packages of cash, totaling $40,000, in the tire well of the trunk.  Upon being confronted about the cash, Mikelic stated that he forgot the cash was there.

After finding the cash, Agent Rubinstein advised Mikelic of his <u>Miranda</u> rights, pursuant to a DEA Advice of Rights card (DEA Form 13A).  A portion of that advice of rights was: "You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before

---

[8] Upon stopping the truck, the driver of the truck informed Lieutenant Carroll that he had delivered three large boxes to the storage unit, and that he had delivered other boxes to that unit in the past.  The driver also completed a written statement to that effect.

any questioning if you wish.  Do you understand?"  Upon being advised of his rights, Mikelic

indicated that he understood his rights, and that he wanted to answer some questions but also

stated that he also wanted to talk to his lawyer.[9]  Agent Rubinstein told Mikelic that he could

speak with his lawyer and would make arrangements for him to do so, but Rubinstein did not call

a lawyer for Mikelic at that time.

Agent Rubinstein also informed Mikelic that a search warrant had been obtained for his

Branford warehouse unit.  Mikelic responded that he had the keys to the warehouse unit and that,

rather than having law enforcement officers break the door to gain entry, he preferred to give

Agent Rubinstein the keys.  Finally, Agent Rubinstein asked Mikelic how much marijuana the

New England Land Air delivery truck had just delivered to the warehouse and Mikelic indicated

that less than 200 pounds had been delivered.  Mikelic was then driven to the Branford Police

Department to be processed for an arrest and further interviewed.

While Mikelic was being transported back to the Branford Police Department, Officer

Paleski and other law enforcement officers entered Unit 7A pursuant to the search warrant issued

by the Connecticut Superior Court.  The officers used the keys that Mikelic gave Agent

Rubinstein to gain entry to the storage unit.  The officers found and opened three wooden crates

that contained heat sealed bags of marijuana and shipping papers.  The officers also found a floor

scale, a heat sealer, and plastic bags in a room inside the storage unit.

---

[9] Agent Rubinstein testified that Mikelic stated "I'm going to give you some information, but I'm not going to give you everything, I want to talk to my lawyer about that."  See also the discussion at page 19, infra, in the text.

After being processed for his state arrest for possession of marijuana,[10] Mikelic was brought to an interview room in the Branford Police Department. Officer Paleski, Detective Perrotti, and Agent Rubinstein were present. Mikelic's handcuffs had been removed, and he was seated at a table. Agent Rubinstein asked Mikelic if he needed to be advised of his <u>Miranda</u> rights again, but Mikelic declined, stating that he still understood his rights. The officers proceeded to question Mikelic and Agent Rubinstein asked if Mikelic would consent to law enforcement officers searching his New York residence. Mikelic stated that there was approximately $30,000 in cash and some marijuana inside his residence and consented to Agent Rubinstein's request to search the house.[11] Mikelic told Agent Rubinstein that he wanted to cooperate, and Mikelic provided Agent Rubinstein with the names and phone numbers of his marijuana sources in California. Mikelic also stated the prices for the marijuana and stated that he bought the marijuana from brokers in California and had the marijuana shipped to his warehouse in Branford.

At some point while the officers were interviewing Mikelic at the Branford Police Department, Mikelic asked to speak to his lawyer. Officer Paleski left the interview room to retrieve Mikelic's cellular phones from his car—the telephone number for Mikelic's lawyer was

---

[10] Mikelic was subsequently indicted in this federal case, and, apparently, the state charge is not being pursued.

[11] Mikelic signed a "DEA Form 88 Consent to Search" and also gave Agent Rubinstein the combination of the lock to his home. Pursuant to his consent to search, Mikelic's New York residence was searched while Mikelic was being interviewed. Law enforcement officers found $30,000 cash and some marijuana. They also found a receipt for another storage facility in New York, which was listed under his girlfriend's name. Mikelic, however, declined during the interview to give his consent to search that storage unit and stated that he wanted to talk to his lawyer about that.

in one of Mikelic's three cellular phones. After giving Mikelic his cellular phones, Mikelic

called his lawyer. Agent Rubinstein offered to exit the interview room while Mikelic called his

lawyer, but Mikelic told Rubinstein that he could stay in the room.[12] Mikelic spoke with his

lawyer and handed the phone to Agent Rubinstein, who also briefly spoke with Mikelic's lawyer.

Agent Rubinstein and Mikelic's lawyer exchanged phone numbers. During the course of the

interview, Mikelic spoke with his lawyer two or three times. Mikelic also sent a text message to

his girlfriend from his cell phone.

After completing the interview, the officers determined that because of Mikelic's

willingness to cooperate, they were not going to detain him in custody. Between approximately

7:30 and 8:00 p.m., Agent Rubinstein and Officer Paleski informed Mikelic that they would

release him on a promise to appear. The officers gave Mikelic back his keys, phones, and car,

and told him to call them tomorrow so that they could meet again to continue the ongoing

cooperation.

Mikelic testified at the evidentiary hearing on the instant motion to suppress and stated

that: (1) upon exiting his vehicle in the Chowder Pot parking lot, Mikelic immediately asked to

speak to an attorney; (2) while in the back of the law enforcement officer's vehicle he repeatedly

requested an attorney but was denied access to one; and (3) Mikelic repeatedly requested to speak

with an attorney at the Branford police station, but was denied every time until the end of the

interview. The Court does not find Mikelic's testimony credible to the extent that it conflicted

with the testimony of Officer Paleski and Agent Rubinstein.

---

[12] During one conversation with his lawyer, Mikelic did ask Agent Rubinstein to exit the
interview room. Rubinstein complied.

**II.**    **Conclusions of Law**

    A.    Search of the Connecticut Storage Unit

Mikelic has moved to suppress evidence obtained from the January 29, 2010, search of his Branford storage unit.  Mikelic claims that the application for the warrant lacked probable cause and, therefore, that the subsequent search of the unit, pursuant to that warrant, violated his Fourth Amendment rights.

The Fourth Amendment prohibits "unreasonable searches and seizures," and it mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Specifically, Mikelic claims that in applying for the search warrant, the officers relied on "conclusory hearsay allegations" and alleges that the officers lacked personal knowledge of criminal conduct by Mikelic.

In Officer Paleski's and Detective Perrotti's affidavit and application for the June 29 search warrant, they included information provided to them from the Nebraska State Patrol as well as Branford police officers and Officer Cari of the East Haven Police Department, who conducted the canine sweep of the Branford storage unit.  Mikelic argues that the officers should have submitted an affidavit from the Nebraska State Patrol and from Officer Cari, establishing the reliability of the evidence seized in Nebraska and the reliability of the canine examination of the warehouse.

It is well settled that an affidavit to a search warrant that relies on hearsay "'is not to be deemed insufficient on that score, so long as a substantial basis for crediting that hearsay is presented.'" Illinois v. Gates, 462 U.S. 213, 241-42 (1983) (quoting Jones v. United States, 362

U.S. 257, 269 (1960) (overruled on another point by United States v. Salvucci, 448 U.S. 83 (1980))). Government investigatory agents are entitled to a "presumption of credibility" when a court evaluates their hearsay information in an affidavit. United States v. Morill, 490 F. Supp. 477, 478 (S.D.N.Y. 1980) (finding probable cause in an affidavit based in part on hearsay information provided by federal and local law enforcement agents); see United States v. Ventresca, 380 U.S. 102, 111 (1985) ("Observations of fellow officers of the [federal] Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."); Velardi v. Walsh, 40 F.3d 569, 574 (2d Cir. 1994). Furthermore, Officer Paleski testified that he viewed via email attachment the photographs of the apparent drug ledgers, bill of lading, shipping receipts, and the car rental receipt, as well as photographs of Bret Battistelli standing in the marijuana grows. Through his training and experience, Paleski was able to identify the items in these photographs to be those items he later described in his affidavit. Given the "great deference" afforded to a finding of probable cause by a judge, see Illinois v. Gates, 462 U.S. 213, 236 (1983), the Court finds that the information included in the officers' affidavit concerning the Nebraska stop had a substantial basis to be credited by the court in issuing the warrant.

Although the officers did not provide an affidavit regarding the dog's reliability, the officers' affidavit in the application for the search warrant did state that Daro was "trained in the detection of illegal drugs, including Marijuana." See United States v. Negron, No. 04 CR. 929, 2005 WL 701237, at *1–2 (S.D.N.Y. Mar. 25, 2005). The officers' affidavit also identified Officer Cari as the handler of the dog and stated that Officer Cari was a member of the East Haven Police Department. The Court finds that the information included in the officers'

application was also sufficient for purposes of establishing the reliability of the dog "sniff" evidence.  See, e.g., United States v. Glover, 957 F.2d 1004, 1013 (2d Cir. 1992) (holding that a dog's alert to the presence of drugs provides sufficient probable cause to obtain a search warrant).

Given that the information included in the affidavit is reliable, this Court finds that the search warrant contained ample demonstration of probable cause.  The affidavit noted the articles found in the Nebraska stop, including the $100,000 in cash, photos of Battistelli in the marijuana grow, drug ledgers, and shipping receipts for a number of recent deliveries to the storage unit in Branford.  The affidavit listed the following connections to Mikelic: the utility subscriber information listing Mikelic as the subscriber for that storage unit, the phone call to Mikelic's phone number and the corresponding phone contact entry for "Wolfe", and the drug records found in Battistelli's possession naming "Wolfe." Finally, the affidavit describes in detail the results of the dog sniff of the building containing the storage unit.  All of this constitutes sufficient probable cause to satisfy the requirements of the Fourth Amendment. Mikelic's motion to suppress evidence obtained from the Branford storage unit is therefore denied.[13]

---

[13] Relying on United States v. Thomas, 757 F.2d 1359, 1366–67 (2d Cir. 1985), Mikelic argues that the perimeter examination by the canine of his warehouse unit constituted a search, and therefore was unconstitutional because it was conducted without a warrant.  In Thomas, the U.S. Court of Appeals for the Second Circuit found that an canine sniff of an apartment door constituted a search within the meaning of the Fourth Amendment.  See id.  However, the Court declines to extend Thomas to a canine sniff of a commercial storage unit and finds that the evidence shows that the exterior canine sniff of Mikeilic's warehouse did not constitute a search for Fourth Amendment purposes.  See United States v. Lingenfelter, 997 F.2d 632, 637–39 (9th Cir. 1993) (finding that an exterior sniff by a canine of a commercial warehouse does not constitute a "search" for Fourth Amendment purposes); see also Illinois v. Caballes, 543 U.S. 405, 409–10 (2005) (finding an exterior walk-around of a vehicle by a canine does not constitute a "search"); United States v. McKreith, 708 F. Supp. 2d 216, 220 (D. Conn. 2010).

B.    <u>Franks</u> Hearing

Mikelic has also requested an evidentiary hearing to determine whether the affidavit supporting the search warrant contained deliberately or recklessly false or misleading statements made to establish probable cause. The United States Supreme Court has held that "[t]here is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant." <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978). Despite that presumption of validity, the Supreme Court in <u>Franks v. Delaware</u> held that a defendant may challenge the validity of a search warrant if he makes a "substantial preliminary showing" that the supporting affidavit contains deliberately or recklessly false or misleading information. <u>Id</u>. at 164–72; see also <u>United States v. Falso</u>, 544 F.3d 110, 125 (2d Cir. 2008). In order to obtain an evidentiary "Franks hearing," the "defendant must make a substantial preliminary showing that: (1) the warrant affidavit contains a false statement or material omissions that makes the affidavit misleading; (2) the false statement or material omission was the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (3) the false statement or material omission was integral or necessary to the judge's probable cause finding." <u>United States v. Martin</u>, 426 F.3d 68, 73–74 (2d Cir. 2005). In order to avoid "fishing expeditions into affidavits that are otherwise presumed truthful," <u>Falso</u>, 544 F.3d at 125,

> the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

<u>Franks</u>, 438 U.S. at 171.

Besides alleging that officers Paleski and Perrotti relied on hearsay in their affidavit,
Mikelic has provided no allegations of "deliberate falsehood or reckless disregard for the truth."
The only allegations of misinformation concerning the affidavit are the following.

First, that as to the bill of lading and the shipping receipts found in the Nebraska traffic
stop, Officer Paleski only relied on a "Google" search and subsequent "drive-by" of the location
that shipped the marijuana from California by another DEA agent in California. The affidavit
recited that the sender in California was not an auto parts business but a bridal shop (the bill of
lading and shipping receipts found during the Nebraska stop indicated that "auto parts" had been
shipped on a number of occasions from the "Crown Company" in California to the "Crown
Company" in Branford). However, Mikelic has not provided any evidence from which the Court
could find that this claim about the identity of the sender of the marijuana was deliberately false
or made with reckless disregard for the truth, or even that it was untrue.

Second, that Officer Paleski did not disclose in the affidavit that Battistelli is Mikelic's
half-brother. Mikelic argues that his close relationship with Battistelli provides an alternative
explanation for the evidence connecting him to Battistelli, such as his name in Battistelli's phone
and in some of the documents. He seems to argue that with the knowledge of the relationship,
the court would have been less likely to find probable cause, since it is natural for half-brothers
to call each other and have other connections, rather than make calls concerning illegal drug
operations. While material omissions can serve as the basis of a <u>Franks</u> challenge, see <u>Falso</u>, 544
F.3d at 127-28, this Court finds that the relationship between Battistelli and Mikelic is not
material to a finding of probable cause, and need not have been disclosed. Also, there is no

evidence that the Branford police officers were even aware of the relationship between Mikelic and Battistelli at the time they completed their affidavit, and no evidence that the officers omitted this information knowingly or recklessly.  See Falso, 544 F.3d at 128.

Third, that the drug ledgers mentioned in the affidavit were not drug ledgers because the Nebraska State Police did not arrest Battistelli immediately upon discovering those ledgers. However, Mikelic does not present any evidence to show that those ledgers were not in fact drug ledgers but were instead legitimate "business records." He does not attempt to explain what those ledgers actually contained.  Further, he does not allege or offer any proof that the Branford police officers knew that the ledgers were not drug ledgers or that they deliberately or recklessly misled the court regarding the nature of the ledgers.

Fourth, Mikelic seems to claim that the fact that the substantial delivery of marijuana on January 29 occurred after the dog sniff is material to the assessment of probable cause and should not have been omitted.  The argument is that since the delivery occurred after the dog detected drugs in unit 7A, there could not have been marijuana present during the dog sniff.  However, Mikelic offers no proof that the officers knew when seeking the search warrant before the Superior Court Judge that the shipment had occurred and that it contained marijuana; in fact, the shipment occurred after the affidavit was prepared, and the marijuana was discovered in the crates when Officer Paleski executed the search warrant.  Further, the storage unit received a number of recent shipments from the shipping company, and the unit also contained other drug-related materials, such as the floor scale, heat sealer, and plastic bags; those materials as well as the interior of the unit likely held enough drug residue to alert the dog before the delivery on January 29.  Therefore Mikelic does not demonstrate that the officers deliberately or recklessly

omitted material information concerning the dog sniff.

Finally, Mikelic argues that the officers made a deliberately false assertion when they stated in their affidavit that the bill of lading contained an address of "4 Sagamore Way" instead of "4 Sycamore Way." The evidence clearly shows that this was a typographical error and also does not support a finding of deliberate disregard for the truth.

Therefore, Mikelic has only made broad claims that lack specific allegations of deliberate falsehood, and he has also not accompanied his allegations with an offer of proof. Consequently, Mikelic has failed to make a "substantial preliminary showing" of falsehood under Franks and is not entitled to an evidentiary hearing for that portion of his motion to suppress.

B.      Search of Mikelic's Car

Mikelic claims that, while he was restrained in handcuffs in the back of the officer's vehicle in the restaurant parking lot, law enforcement officers searched his vehicle without a valid search warrant. Consequently, Mikelic claims that the items seized from his vehicle should be suppressed.

"Although normally a search is deemed unreasonable within the meaning of the Fourth Amendment unless it is conducted pursuant to a warrant issued on probable cause, it is well-settled that an exception exists for searches made following voluntary consent by an individual with authority over the place searched." United States v. Marin, 669 F.2d 73, 82 (2d Cir. 1982) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 242–43 (1973)); see also United States v. Martino, 664 F.2d 860 (2d Cir. 1981); United States v. Sanchez, 635 F.2d 47, 58–59 (2d Cir. 1980). Even if the defendant did not understand all the potential consequences of giving consent and was not informed of his right to refuse consent, his consent may still be valid. See

Schneckloth, 412 U.S. at 248–49. Nonetheless, consent for the search must be freely and voluntarily given. See id. at 222. If consent is coerced then it is an unreasonable search. See United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).

"To ascertain whether consent is valid, courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." Id. (internal quotations omitted). In applying the "totality of the circumstances" test, the U.S. Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." Ohio v. Robinette, 519 U.S. 33, 34 (1996); see United States v. $19,047.00 in U.S. Currency, 95 F.3d 248, 252 (2d Cir. 1996) ("Inquiries into voluntariness are by their nature fact-based, subjective, and in many cases, finely-tuned."). "Factors the court should consider in assessing the voluntariness of a consent include the defendant's age, intelligence and educational background, the length and nature of his or her interaction with the police, and whether the officers engaged in coercive behavior." United States v. Zaleski, 559 F. Supp. 2d 178, 185 (D. Conn. 2008); see Schneckloth, 412 U.S. at 226–27. The Court should also consider "whether the alleged consenting person was advised of his constitutional rights." United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986).

The totality of the circumstances of Mikelic's arrest and giving of consent do not support a finding of duress or coercion. It is undisputed that Mikelic consented to the search of his vehicle in the restaurant parking lot. Even though Mikelic was in custody at the time he consented to the search of his vehicle (he was in handcuffs and in the back of a law enforcement vehicle), his consent may still be voluntary. "[T]he fact that a defendant is in custody does not

alone vitiate his consent to a search . . . [but] consent to search obtained from a person in custody does 'require more careful scrutiny.'" Puglisi, 790 F.2d at 243 (quoting United States v. Wiener, 534 F.2d 15, 17 (2d Cir. 1976)); see United States v. Watson, 423 U.S. 411, 424–25 (1976). Despite being handcuffed and placed in the back of a law enforcement officer's vehicle, there is no evidence that law enforcement officers forced Mikelic to give his consent or unduly pressured him to consent. Rather, as Mikelic testified at the suppression hearing, he "didn't have a problem with it" and gave his consent.[14] Other factors weighing in favor of finding that Mikelic's consent was voluntary are that Mikelic indicated an immediate desire to cooperate with law enforcement officers and that the evidence shows that Mikelic is literate, articulate, and capable of making an informed decision.[15] Weighing against a finding of voluntariness is Agent Rubinstein's failure to advise Mikelic of his constitutional rights pursuant to Miranda prior to requesting and obtaining Mikelic's consent; however, a violation of Mikelic's rights under Miranda only protects against self-incriminating statements and such protections does not extend to the suppression of physical evidence. See United States v. Reyes, No. 3:06cr120, 2007 WL 419636, at * 4 n.1 (D. Conn. Jan. 30, 2007). Thus, this fact alone is not enough to overcome the many factors weighing in favor of a finding that Mikelic's consent was voluntary.

Finally, as stated above, the Court does not credit Mikelic's testimony that immediately upon being removed from his vehicle by law enforcement officers Mikelic invoked his Fifth Amendment right to counsel as to all questioning. Nonetheless, even if Mikelic had invoked his

---

[14] At the evidentiary hearing, Mikelic testified: "They did ask me if they could search my motor vehicle. I didn't have a problem with it."

[15] Mikelic demonstrated in his testimony at both suppression hearings in this case that he is intelligent and articulate.

Fifth Amendment right prior to consenting to the search of his vehicle, "this fact would not establish a violation of the Fifth Amendment since a request for consent to search does not constitute interrogation within the meaning of Miranda." Zaleski, 559 F. Supp. 2d at 188 (citing United States v. McClellan, 165 F.3d 535, 544 (7th Cir. 1999)). Accordingly, the Court finds that Mikelic voluntarily consented to the search of his vehicle and Mikelic's motion to suppress evidence obtained from that search is denied.

C.    Mikelic's Statements

Mikelic claims that the statements he made to the police, both immediately upon being removed from his car in the restaurant parking lot and after being placed under arrest and transported to the Branford police station, should be suppressed because he was not advised of his Miranda rights and because he invoked his right to an attorney under the Fifth Amendment.

1.    *Statements Made Prior to Miranda Warnings*

Mikelic claims that the statements he made while sitting in the back seat of the law enforcement officer's car, prior to being advised of his Miranda rights, should be suppressed as they were obtained in violation of his rights under the Fifth Amendment. The evidence shows that Mikelic was in "custody" immediately upon being removed from his vehicle in the restaurant parking lot, but was not immediately advised of Miranda rights. See Zaleski, 559 F. Supp. 2d at 188–89 ("Miranda rights cannot be asserted outside the context of custodial interrogation. An individual cannot, therefore, assert his or her Miranda right to counsel before he or she is in custody." (internal citations omitted)). After parking his car in the restaurant parking lot, three police officers surrounded Mikelic's car in the parking lot and ordered him out of his vehicle at gunpoint. Immediately upon exiting his vehicle, Mikelic was frisked, handcuffed, and placed in

the back seat of a law enforcement vehicle.  Prior to advising Mikelic of his constitutional rights,

Agent Rubinstein questioned Mikelic regarding where he had just come from and what was

delivered to the Branford warehouse.  Because Mikelic was in "custody" and had not been

advised of his rights, Mikelic's statements in response to Agent Rubinstein's questions were

elicited in violation of Mikelic's Fifth Amendment rights.  The Government does not dispute

this.  Accordingly, the defendant's motion to suppress any statements he made prior to being

advised of his Miranda rights is granted.[16]

### 2.    *Statements Made After Being Advised of his Miranda Rights*

Mikelic also claims that the statements he made in the restaurant parking lot after being

advised of his Miranda rights and the statements that he made at the Branford police station

should be suppressed because he had invoked his right to counsel pursuant to the Fifth

Amendment.

After Agent Rubinstein searched Mikelic's vehicle and found $40,000 cash in the trunk,

Agent Rubinstein advised Mikelic of his constitutional rights pursuant to a DEA Advice of

Rights card (DEA Form13A) while Mikelic was seated in the back of the law enforcement

officer's vehicle in the restaurant parking lot.[17]  Upon advising Mikelic of his rights, Agent

Rubinstein asked Mikelic whether he understood his rights and Mikelic said "yes."  Then, Agent

Rubinstein asked Mikelic whether he was willing to answer questions and Mikelic responded

---

[16] As discussed in the foregoing analysis regarding the search of Mikelic's vehicle, the Court's finding that Mikelic's statements prior to being advised of his Miranda rights should be suppressed does not affect the Court's holding that the search of Mikelic's vehicle pursuant to Mikelic's voluntary consent did not violate any of Mikelic's constitutional rights.

[17] The language in this advice of rights form satisfies the Miranda requirements.

that "he wanted to answer some questions" but also stated that "he wanted to talk to his lawyer." Mikelic stated, "I'm going to give you some information, but I'm not going to give you everything, I want to talk to my lawyer about that." When asked on cross examination at the hearing on the instant motion to suppress why he did not stop questioning Mikelic when he said he wanted to talk to a lawyer, Rubinstein testified, "He wanted to talk to me. He told me he wanted to talk to me, but he also wanted to talk to his attorney." In response to the Court's question about whether Rubinstein asked questions after he advised Mikelic of his right to counsel, Rubinstein testified that "[Mikelic] volunteered a lot of it . . . [and] he would not stop talking." The Court credits Agent Rubinstein's testimony.

Mikelic argues that he invoked his right to counsel and, therefore, any statements that he made should be suppressed. After being advised of his <u>Miranda</u> rights and invoking his right to counsel, a defendant "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Edwards v. Arizona</u>, 451 U.S. 477, 485 (1981); <u>see</u> <u>Minnick v. Mississippi</u>, 498 U.S. 146, 153 (1990) ("[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney."); <u>United States v. Plugh</u>, 576 F.3d 135, 143 (2d Cir. 2009), <u>vacated</u> 2011 WL 3437664. "Should the suspect 'decide[ ] to remain silent,' the custodial officers must 'scrupulously honor[ ]' that decision." <u>Plugh</u>, 576 F.3d at 143 (quoting <u>Michigan v. Mosley</u>, 423 U.S. 96, 104 (1975)). However, the U.S. Supreme Court has held that law enforcement officers may continue to question a defendant if the defendant only makes a limited request for counsel. <u>See</u> <u>Connecticut v. Barrett</u>, 479 U.S. 523, 529 (1987).

In *Barrett*, after the defendant was advised of his *Miranda* rights, the defendant stated that he "would not give a written statement unless his attorney was present but had 'no problem' talking about the incident." Id. at 525. The police officers continued to question the defendant, and the defendant made incriminating oral statements. Id. at 526. The U.S. Supreme Court found that suppression of the defendant's oral statements was not appropriate because the defendant had only made a limited request for counsel.

> [W]e know of no constitutional objective that would be served by suppression in this case. It is undisputed that [the defendant] desired the presence of counsel before making a written statement. Had the police obtained such a statement without meeting the waiver standards of Edwards, it would clearly be inadmissible. [The defendant's] limited requests for counsel, however, were accompanied by affirmative announcements of his willingness to speak with the authorities. The fact that officials took the opportunity provided by [the defendant] to obtain an oral confession is quite consistent with the Fifth Amendment. *Miranda* gives the defendant a right to choose between speech and silence, and [the defendant] chose to speak.

Id. at 529. Thus, "if the right to counsel is invoked for only a discrete, limited purpose, the Edwards prohibition does not apply to police questioning for other purposes." United States v. Straker, 596 F. Supp. 2d 80, 91 (D.D.C. 2009).

The Court finds that while Mikelic may have unambiguously invoked his right to counsel under the Fifth Amendment, he only invoked that right to a limited extent. The evidence shows that, after being arrested, Mikelic immediately expressed a desire to cooperate with law enforcement officers and wanted to "answer some questions." Mikelic only stated that he wanted to speak with his lawyer with respect to certain questions, but did not immediately identify the questions or issues he desired to consult with his attorney on. Thus, it did not violate the Fifth Amendment for Agent Rubinstein to continue questioning Mikelic following Mikelic's limited

invocation of his right to counsel. There is no evidence that Agent Rubinstein or any other law enforcement officer deprived Mikelic of the opportunity to speak with his lawyer about questions that he wished not to answer without the assistance of counsel. For example, when Agent Rubinstein inquired about the traffic stop and seizure in Nebraska, Mikelic indicated that he would answer questions about his own activity but did not want to answer any questions about other persons without talking to his attorney first; the officers honored Mikelic's request and right to counsel, and did not question him further on that topic. Additionally, when Agent Rubinstein requested Mikelic's consent to search a storage locker in New York, Mikelic stated that he wanted to talk to his lawyer about that and Agent Rubinstein stepped outside the room so that Mikelic could call his lawyer. Mikelic subsequently spoke with his attorney several times during the course of the interview that night. Except for the few instances in which Mikelic requested to speak to his attorney about a certain question, at no time during the course of the interview did Mikelic ever indicate that he wanted to stop cooperating with the officers. Nor did Mikelic's attorney tell the law enforcement officers to cease their questioning. Consequently, the Court finds that there was no violation of Mikelic's Fifth Amendment right to counsel as Mikelic only made a limited request for counsel and that request was honored by the law enforcement officers.

Mikelic also argues that his waiver of his Miranda rights was coerced and that his statements were not voluntarily made. The Fifth Amendment to the U.S. Constitution protects against compelled self-incrimination; however, a defendant may waive this right so long as the waiver is voluntary. See United States v. Anderson, 929 F.2d 96, 98 (2d Cir. 1991). "The Supreme Court has identified the key inquiry in determining whether a violation of the right

against compelled self-incrimination has occurred as 'whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer.'" <u>United States v. Jones</u>, 299 F.3d 103, 110 (2d Cir. 2002) (quoting <u>Garrity v. New Jersey</u>, 385 U.S. 493, 496 (1967)).

In determining the voluntariness of a defendant's statement, the Court must first determine whether the defendant knowingly and voluntarily waived his <u>Miranda</u> rights and then determine whether the defendant's subsequent statement itself was voluntarily made. The same standard applies to both analyses. See <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986) ("There is obviously no reason to require more in the way of a "voluntariness" inquiry in the <u>Miranda</u> waiver context than in the Fourteenth Amendment confession context."); <u>U.S. v. Ul Islam</u>, No. 3:04CR305, 2006 WL 1168015, at *7 (D. Conn. Apr. 28, 2006) (applying the same standard in analyzing whether the defendant's waiver of his <u>Miranda</u> rights and the defendant's confession were voluntary). Courts assessing whether a defendant's waiver of his <u>Miranda</u> rights and inculpatory statements were voluntary must look at the totality of the circumstances under which the waiver and statements were made. See <u>Nelson v. Walker</u>, 121 F.3d 828, 833 (2d. Cir. 1997); <u>United States v. Kaba</u>, 999 F.2d 47, 51 (2d Cir. 1993) ("In evaluating the voluntariness of confessions, we look at the totality of the circumstances in which they were given to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined." (internal quotations omitted)); <u>Green v. Scully</u>, 850 F.2d 894, 902 (2d Cir. 1988) ("There is only one guide—the totality of the circumstances rule."). Factors a district court should weigh in this analysis include "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials." <u>Nelson</u>, 121 F.3d at 833. No

single factor is dispositive; the principal inquiry in determining whether the suspect's waiver of rights and inculpatory statements were obtained by coercion requires a "careful evaluation of the totality of the surrounding circumstances." <u>See</u> <u>Green</u>, 850 F.2d at 901; <u>Schneckloth</u>, 412 U.S. at 226–27 (noting that the analysis does not "turn[ ] on the presence or absence of a single controlling criterion . . . [but rather] reflect[s] a careful scrutiny of all the surrounding circumstances").

The government bears the burden of proving, by a preponderance of the evidence, that a defendant's waiver of his <u>Miranda</u> rights and subsequent inculpatory statements were voluntarily made. <u>See</u> <u>Colorado</u>, 479 U.S. at 168–69 (voluntariness of <u>Miranda</u> waiver); <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972) (voluntariness of confession).

The Court finds that Mikelic voluntarily waived his <u>Miranda</u> rights in the restaurant parking lot. As discussed in the foregoing analysis, Mikelic indicated to Agent Rubinstein that he understood his rights but that he wanted to answer some questions. Although Mikelic was handcuffed at the time with his hands behind his back, there are no other circumstances suggesting that Mikelic's waiver of his rights was coerced; Mikelic was only in the back of the law enforcement vehicle for approximately ten or fifteen minutes after being advised of his <u>Miranda</u> rights and there is no indication that the law enforcement officers' conduct was coercive.

Additionally, the Court finds that Mikelic's statements were voluntarily made. There is no evidence that the police coerced Mikelic to make a statement; rather, the evidence shows that Mikelic immediately expressed a desire to cooperate with the law enforcement officers and that the discussion between Mikelic and Agent Rubinstein in the restaurant parking lot was

conversational in tone.

After Mikelic was transported to the Branford police station, he was booked and placed in a detention cell. Shortly thereafter, Mikelic was brought to an interview room where he met with Officer Paleski, Detective Perrotti, and Agent Rubinstein. Agent Rubinstein asked Mikelic if he needed to be advised of his <u>Miranda</u> rights again, but Mikelic said that he still understood his rights and stated that he wished to continue cooperating. The conditions of the interview were not oppressive; Mikelic was not handcuffed, he was seated at a table with the officers, he was allowed access to his cellular phones to contact his attorney and girlfriend, and he was held for a reasonable period of time (from approximately early afternoon to around 7:30 or 8:00 p.m.). <u>See Green</u>, 850 F.2d at 902. Additionally, Mikelic indicated again that he understood his rights and expressed a desire to answer the officers' questions. Mikelic stated that the case was "a lot bigger than him" and that he would lead the officers to his marijuana sources in California. Finally, there is no evidence that the conduct of the law enforcement officers was coercive.[18] <u>See id.</u> (stating the relevant factors a court should consider when analyzing law enforcement's conduct). In fact, the evidence shows that the interview between Mikelic and the law enforcement officers was not oppressive and the tone of the questioning was not confrontational.

Therefore, the Court finds that there was no violation of Mikelic's Fifth Amendment rights and that both his waiver of his rights and subsequent statements in the restaurant parking

---

[18] Mikelic claims that Agent Rubinstein coerced him to cooperate. Specifically, Mikelic claims that Agent Rubinstein stated: "[Y]ou need to decide who you want to be. . . . there are people who cooperate and there are people who go to jail. You decide who you want to be." However, the Court does not find this portion of Mikelic's testimony credible.

lot and at the Branford police station were voluntary.[19]  Accordingly, the defendant's motion to suppress these statements is denied.

**III.**     **Conclusion**

Accordingly, the defendant's motion to suppress [Dkt. #92] is GRANTED IN PART AND DENIED IN PART.  Also, the defendant's motion for a <u>Franks</u> hearing [Dkt. #89] is DENIED.

SO ORDERED this 19th day of September 2011, at Hartford, Connecticut.


_____/s/ Christopher F. Droney_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

---

[19] The suppression of Mikelic's statements made prior to him being advised of his <u>Miranda</u> rights does not affect the constitutionality of Mikelic's subsequent statements.  The U.S. Supreme Court has stated:

> It is an unwarranted extension of <u>Miranda</u> to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.  Though <u>Miranda</u> requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

<u>Oregon v. Elstad</u>, 470 U.S. 298, 309 (1985).